BOESCH *v*. WHITNEY.

1. CORPORATIONS — STOCKHOLDERS' SUIT — OFFICERS — FRAUD — GOOD FAITH — EVIDENCE — FINDINGS — OIL AND GAS LEASE SYNDICATE.

In stockholders' suit on behalf of corporation against its former president, secretary and assistant secretary and the corporation for an accounting for money alleged to have been improperly and illegally paid the individual defendants by the corporation out of receipts from oil and gas sold from leases owned by syndicate in which the individuals claimed an interest, record *held*, to support trial judge's findings that there was no fraud or lack of good faith on the part of defendant officers, that relation established resulted from a business proposition carried on without favoritism to anyone and at a fair profit to the corporation, the parties openly conducting themselves under a written syndicate agreement which was authorized by the corporation's charter and which was fair and valid as between the contracting parties.

2. SAME—STOCKHOLDERS' SUIT—ACCOUNTING—FINDING OF COURT—RATIFICATION—SYNDICATE—RECORD.

In stockholders' suit on behalf of corporation against officers of corporation who had participated with it in syndicate of oil and gas leases for accounting of funds paid individual defendants, findings of trial court that such action was thoroughly explained and ratified at subsequently held and well-attended meeting of stockholders and, yet later, like approval had at meeting of board of directors were amply supported by record.

3. CONSPIRACY—CORPORATIONS—OFFICERS—ACCOUNTING—OIL AND GAS LEASE SYNDICATE—EVIDENCE—INFERENCES.

Claimed conspiracy between defendant officers of corporation in whose behalf plaintiff stockholders brought suit for accounting as to moneys alleged to have been illegally paid incident to operation of oil and gas lease syndicate in which corporation was a participant and which financed the undertaking in large part *held*, not shown nor inferable from circumstances presented.

4. CORPORATIONS—OFFICERS' CONTRACTUAL DEALINGS WITH CORPORATION—BURDEN OF SHOWING GOOD FAITH—FRAUD.

In stockholders' suit for accounting as to moneys alleged to have been paid illegally to defendant officers incident to conduct of oil and gas lease syndicate in which corporation and officers participated, defendant officers sustained burden of showing good faith and freedom from fraud, if they had such burden under circumstances by reason of being corporation's officials.

5. EQUITY—REHEARING—NEWLY-DISCOVERED EVIDENCE.

Rehearing in suit for accounting, brought by stockholders on behalf of corporation against its officers, was properly denied where no good purpose would be served thereby and newly-discovered evidence proffered appears to be cumulative, and showing of diligence in procuring it, insufficient.

6. CORPORATIONS—STOCKHOLDERS' SUIT—COSTS ON APPEAL.

In stockholders' suit against corporation and its officers for accounting as to funds alleged to have been paid latter by former incident to operation of a syndicate of oil and gas lease properties, costs of appeal are allowed individual defendants against plaintiffs upon affirmance of decree dismissing bill.

Appeal from Kent; Hoffius (Cornelius), J. Submitted October 13, 1942. (Docket No. 16, Calendar No. 42,078.) Decided December 23, 1942.

Bill by Herman W. Boesch and Wallace Gilroy, in behalf of the Wolverine Natural Gas Corporation, against Paul B. Whitney, Esther White, George Vruggink, and Wolverine Natural Gas Corporation for an accounting, an injunction, and other relief. Bill dismissed. Plaintiffs appeal. Affirmed.

*Linsey, Shivel, Phelps & Vander Wal,* for plaintiffs.

*Fuller, Sherk & Dilley,* for defendants Whitney and Vruggink.

*Kim Sigler,* for defendant Esther White.

Chandler, C. J. The Wolverine Natural Gas Corporation, one of the parties to this suit, was incorporated under the laws of the State of Michigan on April 15, 1935, with its principal office located in the city of Grand Rapids. It had an authorized capital stock of $2,000,000, but its entire capital stock was not sold, it having stock unissued at the time of the institution of this suit in the amount of $978,000.

It originally acquired natural gas properties in what is termed the "Six Lakes Field" in the vicinity of Grand Rapids, and until the year 1938 was engaged exclusively in the production and sale of natural gas.

In 1936, Paul B. Whitney, one of the defendants herein, was made president, treasurer and general manager of the company, as well as a member of its board of directors, and continued as such until Sep-

tember 30, 1941. He was a graduate of the engineering school of the University of Colorado, and was a geologist and petroleum engineer, having been engaged in that business since 1917.

Defendant George Vruggink, from June, 1937, until September 30, 1941, was secretary of the corporation as well as a member of its board of directors.

Defendant Esther White, from May, 1937, until February 14, 1940, was assistant secretary of the corporation, but after the latter date ceased to be an officer thereof.

The plaintiffs and appellants, stockholders in the corporation, filed their bill of complaint herein on April 2, 1941, allegedly on behalf of the corporation, against the three individual defendants above named for an accounting for large sums of money, which it is alleged were improperly and illegally paid to them and each of them by the corporation out of moneys received by it for oil and gas sold from leases in which the above-named individual defendants claim to have an interest, but in which as a matter of fact they have no interest.

The plaintiffs in their bill of complaint allege that the corporation purchased from George F. Herr, Byron MacCallum and H. C. Williams a so-called working interest in certain oil and gas leases with the intention of drilling oil and gas wells on land covered thereby, that by the terms of the purchase agreement, the said assignors retained a certain so-called working interest therein and that the corporation, through its officers, the defendants herein, caused to be transferred to defendant Esther White and to one Ira A. Moore certain interests in said leaseholds; that subsequently a part of the interest of said Moore was transferred to defendant Vruggink, without consideration; that the interest which was transferred in the name of defendant White

was owned in whole or in part by defendant Whitney; that the benefit received by defendant White did in fact inure to defendant Whitney either in whole or in part; that in fact defendant White was the nominee of defendant Whitney; and that the defendants entered into this transaction with the intent to defraud the corporation of certain benefits to which said corporation was entitled.

Plaintiffs further allege that in 1939 the corporation engaged in extensive drilling operations for oil and gas upon said leases which proved very profitable and that defendant White had received as proceeds from the oil runs on said leases up to February 28, 1941, upwards of $37,000, and that defendant Vruggink, during said period, had received sums in excess of $16,000; they further allege that the relationship of these defendants to the corporation and its stockholders was a fiduciary one, and that they are not entitled to retain the benefits they have received from said leases. Plaintiffs also allege that the said individual defendants entered into a conspiracy to obtain an interest in these leases, which should rightfully and legally have gone to the corporation; that by reason of this conspiracy they obtained large benefits from the oil and gas obtained therefrom at the risk and expense of the corporation; and that by reason of the fraud perpetrated upon said corporation, through such conspiracy, these defendants should be required to account to the corporation for all benefits received by them through the actions complained of in said bill of complaint.

The individual defendants filed their separate answers to said bill of complaint denying all of the material allegations and particularly any and all fraudulent acts alleged to have been committed by them.

During the trial, by order of the trial court, and by consent of all of the parties litigant, the corporation was made and continued throughout the proceeding a party defendant to said bill of complaint.

The record is voluminous, containing much that is interesting to read. However, that part of the record that is important and has a real bearing upon the issues involved is neither lengthy nor complicated.

At the conclusion of a protracted hearing, the court rendered a lengthy opinion from the bench, which will be later referred to, and then filed an addendum to such opinion which is as follows:

"Addendum to Order Opinion Rendered from
the Bench

"The record of this case is barren of all testimony which would impute fraud or lack of good faith on the part of Whitney in first rejecting the Blue acreage; likewise no fraudulent intentions are deducible from the testimony offered in the purchase of a one-half interest by Whitney for and on behalf of the corporation in conjunction with the copurchasers, Moore and Mrs. White. The managing of the drilling and developing of the Blue acreage by the Wolverine company, the testimony discloses, was strictly a business proposition carried on at a fair profit to the corporation under the terms of a written contract favorable to the Wolverine company. No favoritism was shown the other syndicate holders at the expense of the Wolverine company. They were required to pay their share of expense of operations and did pay their proportionate share as called for by the terms of the syndicate agreement.

"It is also to be observed that in the absence of fraud the officers and directors of the Wolverine Gas Company, according to its charter, are given the right and privilege of dealing with the corporation as though they were strangers. I find no fraud

in the deal involving the purchase and development of the Blue acreage and the formation of the syndicate agreement with the parties in interest.

"The above proposition is limited by the corporation code * of this State to the extent of casting the burden of proving the fairness of the contract entered into between corporate officer and the corporation upon the officer or contract attacked. The evidence adduced in this case satisfies the court that the syndicate agreement was fair in every respect and valid as between the contracting parties.

"Plaintiffs have not met the burden of proof and as heretofore indicated the bill of complaint must be dismissed."

Subsequently, on September 5, 1941, the trial court entered the following decree:

"This cause having come on to be heard upon the plaintiff's bill of complaint, and the answers of defendants, Paul B. Whitney, Esther White, George Vruggink, and the replies of plaintiffs thereto, and Wolverine Natural Gas Corporation having entered its appearance and intervened as a defendant herein, and proofs having been taken, and arguments made by counsel for the respective parties, and the Court being fully advised in the premises,

"It is ordered, adjudged and decreed as follows:

"1. The defendants, Paul B. Whitney, Esther White and George Vruggink, in the part they had in the transactions about which plaintiffs complain in their bill of complaint herein committed no fraud on, and did not conspire among themselves, or with anyone else, against, said Wolverine Natural Gas Corporation, or in any manner overreach said corporation, but acted in entire good faith, and in the best interests of said corporation, and of all of its stockholders, including plaintiffs, or those stock-

---

* See Act No. 327, § 47, Pub. Acts 1931 (Comp. Laws Supp. 1940, § 10135–47, Stat. Ann. § 21.47).—Reporter.

holders of said Wolverine Natural Gas Corporation from whom plaintiffs later acquired their capital stock in said corporation.

"2.   The transactions about which plaintiffs complain and the participation of defendants, Paul B. Whitney, Esther White and George Vruggink, therein, after full and truthful disclosures of the facts regarding such transactions, and such participation, were fully approved and ratified by a large majority of the stockholders of the Wolverine Natural Gas Corporation in annual meeting assembled, without any dissenting vote, and by a disinterested board of directors of said corporation, in a duly constituted meeting of said board, and thereby said transactions, and the participation of said defendants therein, were rendered unassailable by plaintiffs, or by said Wolverine Natural Gas Corporation, or by any of its other stockholders.

"3.   The defendant, Paul B. Whitney, received no money, property, or other material benefits out of the transactions about which plaintiffs complain in their bill of complaint, and the moneys or other material benefits which defendants, Esther White and George Vruggink, received out of said transactions were rightfully received by them, and plaintiffs are not entitled to recover anything for or on behalf of said Wolverine Natural Gas Corporation, or otherwise, from any of said defendants.

"Wherefore, and for the other grounds and reasons contained in the opinion herein, it is hereby,

"Further ordered, adjudged and decreed that plaintiffs' bill of complaint be, and the same is hereby dismissed, but without costs to any of said parties."

Following the entry of decree as aforesaid, on November 3, 1941, plaintiffs filed an application for rehearing, and on December 4th, filed another application for rehearing.   Both of these applications for rehearing were denied by orders of the trial court filed on December 27, 1941.

On September 12, 1941, plaintiffs took a general appeal and in their brief state the questions involved on said appeal, as follows:

1.   Were the defendants guilty of fraud, abuse of trust and misappropriation of funds of the Wolverine Natural Gas Corporation?

2.   Did defendant Whitney make a full disclosure of the syndicate activities to stockholders and directors?

3.   Should the trial court have granted appellants' two motions for rehearing?

For a better understanding of the questions involved, we deem it advisable, and quite necessary, to review in some detail the facts leading up to, and including, the transactions complained of in the bill of complaint.

Prior to September, 1938, MacCallum and Herr had acquired by assignment and otherwise oil and gas leases on some 2,000 acres of lands in Walker township, Kent county, as well as considerable other acreage in that vicinity, much of which was in what is termed the "Six Lakes Field," where the properties of the Wolverine Natural Gas Corporation are located.   This acreage was divided into lots or blocks, evidently for trading or sale purposes. These individuals, as indicated by the record, were of limited means, and their business was almost exclusively of a promotional character.

In the summer of 1938, MacCallum and Herr contracted with H. C. Williams, a drilling contractor, to drill a well on the Storey farm, which was a part of the 2,000-acre block of leases, and drilling was started in July.

In the early part of September, 1938, drilling had reached what is termed the Traverse formation, about the depth where oil is expected in that part of

Michigan. When Williams had reached this formation, he refused to proceed further with drilling operations until he was paid the money for his services. The amount required to get the well drilled was $2,500; $1,500 to pay Williams, and $1,000 to pay a man by the name of Hill for borrowed money, who evidently had some sort of a lien on the well. MacCallum had been trying to sell a block of 689 acres, which will hereafter be referred to as the "Blue acreage," to the Gulf Refining Company for $2,500. At first, the Gulf Company indicated they would take it but later refused. When the Gulf Company refused the deal, MacCallum went to see Whitney on September 16, 1938, and offered him the Blue acreage block with a $\frac{1}{8}$ interest reserved for $2,500. Whitney claimed because of the financial position of the Wolverine corporation, which was really not of the best at that time, and because of the risk involved in a 100 per cent. development of the acreage, he decided that Wolverine would not take the deal and so informed MacCallum. As MacCallum was about to leave the office, defendant Esther White told him that she would take the deal personally and so informed Whitney. After some discussion between Whitney and Mrs. White, Whitney determined that the corporation might risk taking a part of the deal and he thereupon suggested that the corporation would take a $\frac{3}{6}$ interest in the acreage for $1,500, if she would take $\frac{2}{6}$ for $1,000. Mrs. White agreed and MacCallum drew up a written offer to sell which was accepted by Whitney. On this same day, MacCallum told Williams that he had sold the "Blue acreage" for $2,500 and asked Williams to come to Grand Rapids, which he did on September 17th, and went to the Wolverine Gas Office and was there informed by Whitney that Wol-

verine was going to take $\frac{1}{2}$ of the deal and Mrs. White the remaining $\frac{2}{6}$ interest. Williams told Mrs. White that she was crazy to take that much because if it was a good proposition she didn't need that much, and if it was bad, she certainly would not want a lot of it. As a result of this advice by Williams, Mrs. White decided that she would only take a $\frac{1}{6}$ interest for $500, which left $\frac{1}{6}$ to be disposed of to make up the $2,500. Whitney then advised Mrs. White to go and see Ira Moore, president of the People's National Bank, with whom both were well acquainted, who was a stockholder in the Wolverine, and with whose bank, Whitney, Mrs. White and the corporation did business. This, Mrs. White did, and Moore first decided he would not risk the $500, but later, on the same day, after Mrs. White had left the office, he called Whitney on the telephone and told him he had changed his mind and he would take the $\frac{1}{6}$ interest.

Pending these negotiations, MacCallum and Herr transferred $\frac{1}{3}$ of their $\frac{1}{6}$ reserved interest to Williams; this completed the membership of the syndicate of the "Blue acreage" in the following proportions: MacCallum $\frac{1}{18}$; Herr, $\frac{1}{18}$; Williams, $\frac{1}{18}$; Wolverine, $\frac{9}{18}$; White $\frac{3}{18}$ and Moore $\frac{3}{18}$, such interests being subject to the land owners' $\frac{1}{8}$ royalty.

On September 17th, both Mrs. White and Moore offered to pay Williams $500, but he at that time declined to take the money because he claimed he had certain differences to iron out with MacCallum and Herr.

On September 20th, Whitney gave to MacCallum and Herr the corporation's check for $1,000, which was to be, and was, paid to Hill for borrowed money. Later, on September 27th, upon written order from MacCallum and Herr, Whitney for the Wolverine

and Mrs. White gave Williams checks for $500 each, and Moore and Vruggink each gave Williams a check for $250, which completed the payment of $2,500 for the purchase price of 689 acres known as the "Blue acreage."

On September 27th, Whitney prepared and received from MacCallum and Herr assignments of the leases on the "Blue acreage" in the following proportions: ½ to Wolverine; ⅙ to Esther White; ⅙ to Ira Moore, and later Moore executed an assignment of ½ of his ⅙ interest to Vruggink.

The deal between Moore and Vruggink was brought about in the following manner. Some 10 days or more after September 17th, Vruggink was in Moore's office and said if he could have raised the money he would have taken a share and Moore then told him that he would let him have a ½ interest of what he had acquired. Following that conversation, the wife of Vruggink arranged to obtain the money, Moore's offer was accepted and he obtained from Moore an assignment of ½ of Moore's interest in the syndicate.

Nothing further was done until on or about the 22d day of November, 1938, when Mr. Whitney prepared an agreement between the parties to the syndicate to conduct development operations on oil and gas leases, which was as follows:

"Whereas, Byron MacCallum and George F. Herr, of Detroit, Michigan, did, on September 27, 1938, assign to the Wolverine Natural Gas Corporation an undivided ⅗ working interest, and upon same date did assign to Ira A. Moore, of Grand Rapids, Michigan, an undivided ⅙ working interest, and upon same date did assign to Esther White an undivided ⅙ working interest in and to certain oil and gas leases, in Walker and Wyoming town-

ships, Kent county, Michigan, as fully described in said assignments to which reference is herein made, and

"Whereas, the ⅙ working interest remaining is now owned as a ⅙ undivided working interest by the following three parties in the proportions shown viz.: Byron MacCallum ⅓ of the ⅙ or 1/18, of the whole; George F. Herr, ⅓ of the ⅙ or 1/18 of the whole and H. C. Williams of Edmore, Michigan, ⅓ of the ⅙ or 1/18 of the whole, and

"Whereas, it is desired by all parties hereto that drilling for oil or gas, and operations for producing same should be commenced and carried on by the Wolverine Natural Gas Corporation upon said leaseholds.

"Now, therefore, it is herein agreed by the parties hereto, that the Wolverine Natural Gas Corporation may proceed and continue with drilling and production operations upon said leaseholds and that the total cost and expense of such operations, whether such operations result in productive wells, dry holes or otherwise, shall be borne and paid for pro rata by the parties hereto in proportion to their working interest in said leases, which proportionate share as of the date hereof is as set opposite their names following:

| Byron MacCallum | 1/18 | Ira A. Moore | ⅙ |
| George F. Herr | 1/18 | Esther White | ⅙ |
| H. C. Williams | 1/18 | Wolverine Natural Gas Corp. | ½ |

"Furthermore, Byron MacCallum, George F. Herr, H. C. Williams, Ira A. Moore and Esther White hereby agree and consent, that if the Wolverine Natural Gas Corporation does advance in their behalf sums of money from time to time, to cover their total ½ working interest, which is the equivalent of "carrying" them for their working interest, that the Wolverine Natural Gas Corporation may recover said sums, plus a legal rate of interest if

any period of time shall be involved, and also plus an additional flat amount of $900 for every commercially productive well so drilled with moneys advanced by the Wolverine Natural Gas Corporation, said amount to be prorated as follows: Byron MacCallum, George F. Herr and H. C. Williams each $100 and Ira A. Moore and Esther White each $300, by deducting same from any revenue due them from the sale of oil or gas from any or all wells upon said leaseholds. Excepting, however, that the provisions of this paragraph shall not apply to any of the individual parties hereto who may have advanced his share of cost and expense or who does pay his share immediately upon demand and request of the Wolverine Natural Gas Corporation.

"Byron MacCallum, George F. Herr, H. C. Williams, Ira A. Moore and Esther White agree to sign all proper division orders as same may from time to time be required to be signed, and also agree to sign such transfer orders unto the Wolverine Natural Gas Corporation as may become necessary to insure to the Wolverine Natural Gas Corporation, the recovery of any moneys advanced by Wolverine Natural Gas Corporation in their behalf.

"The Wolverine Natural Gas Corporation is hereby authorized to contract and sell all of their (Byron MacCallum, George F. Herr, H. C. Williams, Ira A. Moore and Esther White) share of any oil or gas produced, at the best prevailing prices obtainable and at the same price and on the same basis as it, the Wolverine Natural Gas Corporation receives for its production.

"The Wolverine Natural Gas Corporation herein agrees to keep proper records and accounts of the cost of all operations and render proper statements to Byron MacCallum, George F. Herr, H. C. Williams, Ira A. Moore and Esther White, whenever same shall be proper and necessary.

"This agreement shall extend to and be binding upon the heirs, executors, administrators, successors or assigns of all parties hereto."

There was some conflict in MacCallum's testimony and the testimony of Whitney, Moore and Vruggink, relative to the foregoing history of this transaction. However, the trial court found that the foregoing was the correct version of what transpired from September 16th or thereabouts up until the time of the execution of the syndicate agreement, and under the record in this case we are inclined to agree with the trial judge that it is a correct statement of what actually transpired.

After Williams had verified the fact that his money for drilling would be forthcoming, he continued drilling on the Storey well until September 24th, when they obtained some showing of oil in the Traverse formation. Later, in October, the well was acidized a couple of times and for some time thereafter attempts were made to make a producing well of it, but it never became a commercial producer.

Later, the so-called Smith-Whalen No. 1 well was brought in on lands not involved here and by parties in no way concerned in the Wolverine or the syndicate membership, but on acreage that was about a mile distant from the lands on which the "Blue acreage syndicate" had leases. This well was an oil producer in commercial quantities and stimulated activities in that area. Later, the Smith-Whalen No. 2 well was completed and this apparently was proof satisfactory to the owners of leaseholds in that vicinity that that area was a proven one for oil production and caused a demand for acreage in the Walker field.

On February 7, 1939, the syndicate drilled its first well, known as Orlik No. 1, as an offset to Smith-Whalen No. 2, which was completed on February 24, 1939, which proved to be a producer of oil in large quantities, and the syndicate commenced

getting returns from said well about February 26, 1939, the first cash being received in March 1939.

After Orlik No. 1, the Wolverine Corporation drilled three wells in which it was a 100 per cent. owner, which were completed on April 25, 1939, May 10, 1939, and May 16, 1939, respectively. These wells were also offsets to wells which had been drilled by other producers, and all proved to be good producing wells.

The second syndicate well, Johnson No. 2, was completed May 22, 1939, as an offset to a well drilled by another producer.

The drilling by the syndicate continued until it had completed and was operating 17 producing wells, and the record shows that by February 28, 1941, the gross revenue from the .oil runs of the syndicate was upwards of $410,000.

During this same period, the Wolverine drilled and put in operation on other acreage in the Walker field, of which it was 100 per cent. owner, 23 wells, all of which proved producers of oil in considerable quantities. The Wolverine obtained this acreage on which it drilled these 23 operating wells in the following manner. For geological and other work done by Mr. Whitney for other parties owning leases in Walker field he was to receive acreage to the amount of 260 acres. However, the leases on this 260 acres were, by direction of Whitney, assigned directly to the Wolverine Natural Gas Corporation, although Whitney claimed that the work done by him was mostly at night and on Sundays and not on time to which the corporation was entitled. Whitney also secured for similar work assignments of leases on 200 acres of other lands. These leases were assigned directly to Wolverine, Whitney receiving nothing therefor. So, it is apparent that Whitney, individually, received no acreage whatever or any

benefit or profit either from the syndicate properties or from the other two leasehold interests obtained by him as above set forth.

Relative to the formation and operation of the ''Blue acreage syndicate,'' the findings of the trial court in his opinion are quite extensive, but we see no need for quoting them in full as they are briefly summarized in the addendum opinion hereinbefore quoted. However, plaintiffs insist that the individual defendants, who were officers of the company, have, in violation of the duties they owed to the stockholders of the corporation to act entirely in the interests of said corporation, taken advantage of their position to secure these individual interests in the syndicate, and have, with the investment of little or no capital, obtained large benefits and profits from this transaction to the detriment of the said corporation; that by such violation of their fiduciary relationship they should be required to restore to the corporation those benefits, advantages and profits obtained by them as hereinbefore set forth.

If these transactions were the result of a conspiracy between the individual defendants, or if they had been conducted in secret and the stockholders and directors of the company had been deceived thereby, there would indeed be much force to this contention. However, it appears from the record that at the annual meeting of the stockholders, held on February 14, 1939, at which upwards of 642,000 shares out of the 1,020,000 shares of outstanding stock were present and voting, that all acts and doings of the officers and board of directors of the corporation since its last annual meeting were in all respects approved, ratified and adopted. The testimony of defendant Whitney, Ira Moore and one Siegel Judd of the law firm of Warner, Norcross &

Judd, a witness for plaintiff, was that Mr. Whitney made a full statement and explanation of the Blue acreage transaction up to that time; that the president had a large map on the wall in front of the stockholders on which map the Blue acreage was shown in blue color; that he stated that this acreage was owned by a syndicate in which the Wolverine owned a one-half interest; that the other members of the syndicate were Mrs. White, Vruggink, Ira Moore, MacCallum, Herr and Williams; that they had a syndicate agreement; that there was 689 acres in the Blue acreage; and that the one-half interest had cost the Wolverine $1,500. He (Whitney) stated that the first syndicate well was being drilled and that if such well were a dry hole, Wolverine would have to pay only one-half of the cost, and the other syndicate members would have to pay the other one-half; that if it were a dry hole, the cost would be about $4,000, of which Wolverine would have to pay $2,000. He explained how it happened that the leases came to be acquired from MacCallum and Herr, and, as bearing upon the details of this testimony, we quote some excerpts from the testimony of plaintiff's witness Judd and also the findings of the court on this branch of the case. On cross-examination, Judd testified:

"*Q.* Mr. Judd, subsequent to the time you were on the stand a day or so ago, did I inquire of you concerning whether or not you attended a meeting of the stockholders on the 14th of February, 1939?

"*A.* Yes, you did.

"*Q.* Did I call your attention at that time to page 94 of Exhibit 1 a minute book which has been introduced in this case which is a record of the annual meeting of the shareholders of the Wolverine Natural Gas Corporation so held at the office of the company on the second floor of the Keeler building, Grand Rapids, Michigan, at 3 o'clock in the after-

noon of Tuesday, February 14, 1939, pursuant to notice duly given?

"*A.* You did.

"*Q.* And did I ask you whether or not you attended that meeting?

"*A.* Yes, you did.

"*Q.* And did you attend the meeting?

"*A.* I did.

"*Q.* And who was in charge of the meeting?

"*A.* Mr. Whitney, the president, presided.

"*Q.* And after the meeting had been called to order by Mr. Whitney, do you recall any discussion concerning the subject of the acquisition of oil wells, et cetera?

"*A.* I do.

"*Q.* Now it appears upon page 97, which is a continuation of the reports of that same meeting, the following: 'The president then reported on the affairs of the corporation describing the acquisition of oil leases and drilling program and the contract with the Consumers Power Company and its prospect for the future and referred to the president's report to stockholders under date of January 25, 1939.'

"*Q.* Do you recall while you were present at that meeting any discussion concerning the so-called Blue acreage?

"*A.* Yes, that was discussed.

"*Q.* Did Mr. Whitney make any statement concerning the Blue acreage at that stockholders' meeting?

"*A.* He explained the transaction to the stockholders.

"*Q.* All of the facts and circumstances. Briefly and to the point what did Mr. Whitney say?

"*A.* In his explanation of the deal to the stockholders, well, he made the statement as to how the leases came to be acquired, what they were, and how it happened and before he got to the point of naming who the individual owners were of the other half

interest and some broker asked who they were and Mr. Whitney named them.

"*Q.* And did he on that occasion tell the stockholders that the Wolverine Natural Gas Corporation owned a one-half interest in these leases?

"*A.* Yes, he had a map on the wall which showed the ownership acreage in which he had a full ownership and a half ownership.

"*Q.* Was that map similar to the one introduced in this case, and did you see the other upon the stand?

"*A.* Yes.

"*Q.* Colored blue?

"*A.* Not the same thing. A larger map. He had it on the wall.

"*Q.* Did he refer in this statement to the stockholders to this map and point out the so-called Blue acres?

"*A.* He did.

"*Q.* Did he tell the stockholders the company owned one-half interest in that Blue acres?

"*A.* Yes, he did.

"*Q.* You say at that point, or thereabouts, some broker in the audience asked Mr. Whitney who the other interested parties were?

"*A.* Correct.

"*Q.* And what did Mr. Whitney say in response to that inquiry?

"*A.* He named the other interested stockholders and gave their interest, that is, the amount of their interests.

"*Q.* What individuals did he name?

"*A.* Named Mr. Moore and Mrs. White and Mr. Vruggink.

"*Q.* Do you recall his mentioning Mr. MacCallum and Mr. Herr?

"*A.* He mentioned them in connection with the acquisitions of the leases, how they came to acquire them.

"*Q.* Was there any further discussion had concerning the subject, any questions other than the one asked about who the parties were?

"*A.* Well, at the meeting there developed some differences of opinion among the stockholders as to the advisability of the company going into the oil business. Some thought the company should confine its activity to the original business, natural gas business. That discussion led to a more extensive explanation of the transactions than otherwise if there had not been this opposition.

"*Q.* Now, Mr. Whitney on that occasion explained to the stockholders how Mr. MacCallum had come into the office with the leases and wanted to make this deal, et cetera. Do you remember that?

"*A.* I remember he said they acquired the leases from MacCallum and Herr. I don't remember whether or not he explained just how he came into the office.

"*Q.* Then there appears at page 97 a further notation: 'After a general discussion on motion of Mr. Ira A. Moore, supported by Mr. Annis, the following resolution without dissenting vote was unanimously adopted.' (Reading)  *  *  *

"*Q.* Now was that resolution so proposed as indicated in these minutes by Mr. Moore and supported by Mr. Annis adopted after this discussion that Mr. Whitney engaged in?

"*A.* Yes, that was the last thing that was done."

On December 1, 1939, at a meeting of the board of directors of the corporation at which all of the members of the board were present, the record shows that the following occurred:

"The president, Mr. Whitney, explained the full workings of the syndicate holdings to the board and upon motion by Mr. Clayson, supported by Mr. Peterson, the action of Mr. Whitney in regard to the operation of the syndicate holdings was ratified.

"The president, Mr. Whitney, made a report to the board relative to acts regarding the purchase of equipment, generating plants, trucks, and the signing of notes and contracts. Upon motion by Mr. Clayson, supported by Mr. Peterson the following resolution was adopted:

"Resolved that all acts of the president Mr. Whitney, in the general conduct of the business during the year 1939 be and hereby is approved, ratified and adopted."

We also quote from the opinion of the trial court delivered from the bench at the conclusion of the trial.

"Now here is the thing that seems to me to be decisive of the case: What Whitney did in taking a half interest in this acreage for the Wolverine company and the holdings of White, Moore and Vruggink, MacCallum, Herr and Williams, were disclosed to the officers and to the stockholders of the corporation. The corporation ratified what Whitney did and I am satisfied from the testimony in this case it was brought to the attention of the directors and stockholders of this corporation. I think it was Mr. Judd who testified he was at a meeting where a map was posted up of the Blue acreage and that the field was depicted on this map; that Mr. Whitney explained the Blue acreage and that a couple of wells were in process of drilling then; that he explained the syndicate agreement and that he was asked from the floor by one of the stockholders present who the other members of the syndicate were and he named them.

"Mr. Judd's testimony is corroborated by others, so I take the position, Mr. Judd being disinterested in this litigation, that he testified to what happened. If my memory serves me correctly this occurred at the February 14, 1939, annual meeting. Now with that knowledge and information before them, that which Whitney had done for the corporation in buy-

ing an interest in this acreage with the other syndicate members was ratified and confirmed and approved. Does that mean that everyone of the 1,400 stockholders knew about it? No, of course, it doesn't.

"But it was an annual meeting and was apparently well attended in person and by proxy by the required number of stockholders. Its action was reported I think either verbally or in writing. It doesn't make much difference whether all said was recorded, except when in writing it is not subject to dispute and quibbling, but the report was approved and ratified. Later on there was a board of directors meeting. Again, if my memory serves me correctly, the whole syndicate arrangement was brought to the attention of the board of directors and again there was a ratification and approval of the acts and doings of Mr. Whitney in regard not only to the syndicate's doings but all acts of the officers performed for the year 1939.

"If that is true and I believe the evidence produced on this point then since at the beginning the company had authority to buy part interest in oil leases and its business was entrusted to Whitney, Mr. Whitney had authority to buy this acreage and enter into this syndicate agreement. The board of directors and stockholders could approve and make legal and valid that which they could do in the first instance.

"It has also been shown that there was certain acreage turned over to Mr. Whitney for assistance he gave others in that field and that he turned this acreage over to the Wolverine company. There is no proof that he personally profited from any deal he entered into for the Wolverine company. I will be very frank to say that as this case progressed I thought it would be brought out that Whitney had profited through the moneys received by Vruggink and Mrs. White and that it would be shown that he had an interest in her share or in that received by

Mr. Vruggink. The record is entirely barren on the subject. So apparently he hasn't profited one way or the other from any source.

"Now under the syndicate agreement as to drilling the Wolverine company did a remarkable profitable job. Its income from this oil field, if I remember correctly, has run upwards of $125,000, $5,000 being in penalties and perhaps $21,000 for operation costs or charges. In all of these charges was a profit to the Wolverine company aside from the Wolverine company getting one-half of the oil run checks.

"So I believe Whitney certainly has not dissipated, squandered or given away anything that the company has produced and the action on his part was ratified by the stockholders and by the directors. He has made the most out of the contract that he entered into with the other syndicate holders for the Wolverine company. It has been a source of profit to the Wolverine company not only the oil run checks for its one-half holdings, but the operation of the syndicate, the renting of the company trucks, equipment and tanks."

After careful perusal of the record, exhibits, and briefs of the respective parties, we are persuaded that the findings and conclusions of the trial judge find ample support, and that no other findings or conclusions than the ones so reached would have been justified.

There is no testimony showing any conspiracy between the defendants nor any circumstances from which a reasonable inference that a conspiracy existed could be drawn.

If the fact that the individual defendants were officers of the corporation placed the burden upon them of showing that the transactions complained of were in good faith and free from deceit and fraud, in our opinion, the burden of so showing by defend-

ants has been discharged, and the trial court was not in error in the entry of a decree dismissing the bill of complaint.

We have examined with care the two motions for rehearing hereinbefore referred to, the answers thereto and the opinions of the trial judge denying said motions. We are in accord with his conclusion that no good purpose would be served by the granting of a rehearing. It fairly appears that the newly-discovered evidence proffered by said motions would be cumulative of the proofs offered by plaintiffs and received upon the trial of said cause, and further, in support of said motions, there was no sufficient showing of due diligence on the part of plaintiffs to obtain the evidence proffered. There was no error on the part of the trial judge in denying said motions for a rehearing.

The decree is affirmed. The trial court awarded no costs. However we deem it advisable to award to the individual defendants the costs of this appeal against plaintiffs.

BOYLES, NORTH, STARR, WIEST, BUTZEL, BUSHNELL, and SHARPE, JJ., concurred.